[COPYRIGHT, 1899, BY CARL G. JAHN.]

---

(Lucas Co., Ohio Court of Common Pleas.)
MARY A. SMILEY v. MATTHEW BARTLETT.

There being no ecclesiastical courts in this country, courts of chancery have jurisdiction in actions in reference to the burial of the dead, or as to the body remaining in or being removed from a certain place of burial. Held, therefore, under the facts of this case, that a petition asking the court to order the removal of the body of a certain dead person from the place where the same was buried, to another certain place of burial, will be refused.

LEMMON, J.

We find that the husband of Mrs.

Holmes, deceased, purchased a cemetery lot in the Mt. Oliver cemetery, at Pittsburg, Pa., south side, in the year 1836, on which to bury, and with the intention then of burying the death child of Mr. Holmes and his wife, and that he probably then expected it to be the family burying ground. That subsequently, at the time of his death, or just before his death, looking forward to the probability of his decease, he requested that his wife be buried by his side, and that he then had in view that lot in that cemetery which he procured in 1836. The evidence satisfies us of this; and it also satisfies us that she then said to him that she would, and that she intended it as he wished it at that time. We are satisfied also from the evidence that this was understood in the family, and that the family, including Mrs. Bartlett, expected that wish to be carried out, and entertained no feeling in opposition to it. The evidence satisfies us of all this, and that this was the expectation generally in the family, we think, as to some of them, down to almost the period of Mrs. Holmes' death, and that Mrs. Bartlett herself was expecting that this would be carried out, and was desirous herself of seeing the will of her parents—which had been long before that communicated to her—carried out. We are also satisfied, as we find from the evidence, that for a few years before the decease of Mrs. Holmes, living with Mrs. Bartlett—who treated her kindly—influenced perhaps largely by this kindness and possibly by some other considerations, changed her desire in reference to this and communicated it to Mrs. Friedlander, and enjoined upon Mrs. Friedlander certain duties in regard to the preparation of her body for burial, the funeral and the place of burial. That she spoke frequently with Mrs. Friedlander in regard to this, and communicated to her her wish to be buried here at Toledo, where Mr. and Mrs. Bartlett wished, and that she might lie by the side—not of her husband—the former intention—but by the side of her youngest child; that she expressed this upon various occasions, and as she

grew sick and feeble she called the attention of Mrs. Friedlander to it again. That she also spoke to her grandchild—a son of Mrs. Smiley—on the same subject and to the same effect, and repeated this and admonished him, only a few days before her decease, not to forget her command in this regard.

We are all satisfied of the truth of these statements of Mrs. Friedlander and of this grandchild, and they are consistent with the action of the old lady in which she expressed, so fully and so frequently, her strong attachment to this youngest child, with whom she was living and with whom she lived for the last thirteen years of her life, by whom she was supported and attended by day and by night, with unremitting kindness.

This brings us to the consideration of the questions:

1. As to whether this court has jurisdiction in such a proceeding as that begun here, to make an order in reference to the burial of this body, or as to its remaining or being taken out. And—

2. If the court has jurisdiction and power over that subject to proceed to judgment, what its judgment should be, in the light of these findings of fact.

The authorities bear out the assumption that this court, sitting as a court of chancery, has jurisdiction—complete jurisdiction. I find no case in which the question is raised or is elementary in the decision that does not sustain the power of the court, in England or America, in the chancery jurisdiction, there necessarily being no ecclesiastical courts here recognized as having control over the matter—the court of chancery will exercise that jurisdiction which is necessary to secure persons in the right to discharge a duty which they owe to the dead growing out of their relations to them, their friendship, having an acquaintance with them, and growing out of considerations of decency and piety, which always inhere in matters of this kind.

We come, then, to the only remaining question: What should the court

do under these circumstances?

The husband cf Mrs. Holmes died in 1855. Many years elapsed after his decease during which she lived, most of the time, either with Mrs. Smiley or with Mrs. Bartlett, her daughter "Josie". Up to the time that she came to live with Mrs. Bartlett, the evidence shows that Mrs. Holmes was an active woman, in good health and doing her share in taking care of household duties. She was by no means an incumbrance during this time, but a help, and there is no contradiction cf this—the testimony all indicates it—but during the last six or seven years of her life she was unable for a considerable portion of the time to be out of bed, unable to dress herself, unable to feed herself, and had to be washed, dressed and fed and attended to, and this attention was freely given at all times by this one daughter, and the whole matter was at her expense. Mrs Holmes was well fed and well clothed during this time, and every comfort given her, the other children, some three or four of them—scarcely even remembering her with presents. They testified to giving her presents; but the testimony is contradicted, and we think the contradictory evidence the stronger. Mrs. Smiley testifies to sending suits of underwear frcm Louisville to Toledc, to her mother; testifies to the time, and that she sent them by the person of her son. The son goes upon the stand and denies it. If they were sent by express, the fact could be easily shown; but upon the son's denial she has allcwed it to rest right there. I must find that she is mistaken. The same son admits that his mother did, as she says, bring some oranges at one time, and he names the number; he says that there were three of them that she handed to him, and that he took them to his grandmother.

Now, in the light of these facts, here are Mr. Bartlett and his wife devoting themselves to that old mother. She is accustomed, with those whom she is familiar with and who call to see her, and especially Mrs. Friedlander, to express herself very confiden-tially and also in the warmest manner in regard to "Josie." At the time of her death these parties were all telegraphed to—some living at Pittsburg and others at other places, except Mrs. Smiley and one of the sons, who testifies that he is editing a paper at Findlay, and between whom and Mr. Bartlett there had grown up some bitterness in years past; they had had great bitterness and litigation, and without knowing what that was, it was sufficient to show that the parties were not on speaking terms. They were not notified by Mr. Bartlett or by his wife, of the death. It came out in proof, however, that Mrs. Smiley was informed of the death of her mother before her burial, not through Mr. Bartlett but in some other way. The parties at Pittsburg and the party who it seems to me is the person who begins this action—although it is begun in the name of Mrs. Smiley—I think this Pittsburg man is the responsible party for the bringing cf this suit—he received the dispatch, but he did not come on to the funeral. He telegraphed back here to send the body to Pittsburg, and this was replied to by saying that the arrangements had all been made for the funeral here, to take place upon Sunday morning. This dispatch was received in Pittsburg too late, he says, for him to come here—although there is some evidence that would make that statement of his possibly a little doubtful. At least, he did not come on, but he came on Monday—got here on Monday evening, the day after the funeral, and went to Mr. Bartlett the next morning and had a very angry conversation—apparently begun by him—with Mr. Bartlett. He announced to Mr. Bartlett, as Mr. Bartlett says, that he had seen his attorney and knew what his rights were. I think Mr. Barker says that he had not seen his attonrey until after this conversation; I am not clear, however, in my recollection about that, but it is unimportant.

Now, under these circumstances, the last will of this old lady being expressed over and over again and in her last days, and sustained by such

natural and excellent reasons—the love of her daughter, the continued kindness of that daughter—we think we should give significance to this. A long time had elapsed since the husband expressed his wish that she should be buried at Pittsburg, and I am the more averse to holding that she should be carried there because the evidence shows me that that little cemetery on the south side, at Pittsburg has been approached and surrounded by houses, and that for fifteen years past they have been discussing the matter of raising the persons who have been buried there and carrying them to another cemetery, and that houses have been built up right up to the cemetery, as one witness said, as though they were right across the street, and all around. The fact also —not disputed—is that the bodies which have been interred in that lot in that cemetery—have not had their resting place marked by a stone or a tablet or monument, and the drawings of the grave offered by Mr. Barker himself show that the grave does not lie straight with the line of the lot.

Under all these circumstances, with these evidences of neglect both to the old lady herself and to that cemetery lot there, we are unable to find and we cannot believe, from this testimony, looking at it as a whole, that this suit is commenced because of proper motives, and we feel that it is the duty of the court to deny the injunction prayed for to restrain Mr. and Mrs. Bartlett from interference with them in removing the body from Toledo to the Pittsburg cemetery, and the petition will therefore be dismissed.